IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Criminal Action No. 07-cr-00188-WDM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

17.    OSCAR GARCIA-RUIZ,

    Defendant.

**ORDER ON DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL
AND MOTION FOR NEW TRIAL**

Miller, J.

This matter is before me on Defendant's Motion for Judgment of Acquittal (Docket No. 1010), and his alternative Motion for a New Trial (Docket No. 1009). After a review of the parties' written arguments, as well as a review of the evidence introduced at trial, I conclude that Defendant's Motion for Judgment of Acquittal should be granted as to Count 15 and his motions should otherwise be denied.

Background

A jury trial took place in this case beginning March 30, 2009 and ending April 3, 2009. During the course of the trial, the government presented evidence of a conspiracy to distribute large quantities of cocaine between many individuals in the Denver area. Defendant's role in the conspiracy was as a "runner," primarily delivering drugs for Alejandro Camacho-Levario ("Camacho"), the alleged head of

this conspiracy and the main local supplier of the drugs. Defendant was convicted for acts occurring on December 7, 2006 (Count 15), December 13, 2006 (Count 17), January 28, 2007 (Count 24), and April 26, 2007 (Count 26), as well as for the conspiracy, which was alleged to have occurred between December 2004 and April 26, 2007 (Count 2).

## Count 15

Both of Defendant's motions focus on Count 15 - knowing and intentional distribution and possession with the intent to distribute more than 500 grams but less than five kilograms of a mixture or substance containing a detectable amount of cocaine. Codefendant Jose Avendano ("Avendano") testified that he was selling cocaine for Camacho (Trial Tr. 251:11-14, March 31, 2009, Docket No. 975) and asked him on December 7, 2006 to bring him drugs (*id.* at 254:24-255:8). Recorded telephone calls between Avendano and Camacho that day corroborate Avendano's testimony. At 10:45 a.m., Camacho asked Avendano if he wanted to "do it right now," and stated, "I will . . . send my cousin." (Pl.'s Ex. 45b.) Avendano responded by telling Camacho, "Alright, send him down." (*Id.*) Avendano testified that he was asking Camacho to bring him drugs in this phone call. (Trial Tr. 255:5-8, March 31, 2009, Docket No. 975.) At 1:06 p.m., Camacho told Avendano, "Okay, my homie is outside, he'll be right there." (Pl.'s Ex. 46b.) It was typical for Camacho to send someone to deliver Avendano the drugs that he ordered from Camacho. (Trial Tr. 256:12-14, March 31, 2009, Docket No. 975.) Finally, in a third phone call that occurred less than one minute after the second, Avendano told Camacho, "I didn't

need . . . that much cause [sic] that other dude flaked out, remember I told you? Well, he already went somewhere else." (Pl.'s Ex. 47b.)  In response, Camacho told Avendano, "Oh, okay, well, then, give him back the other one, dude.  No problem." (*Id.*)  Avendano testified that he did send half of the drugs back with the person who brought them.  (Trial Tr. 258:11-259:15, March 31, 2009, Docket No. 975.)  However, Avendano could not remember who brought him the drugs that day (*id.* at 259:9-10) and that he did not recognize anyone in the courtroom as someone who had delivered cocaine to him, including Defendant (*id.* at 253:22-24).

Officer Mike Prince ("Prince") of the Aurora Police Department (Trial Tr. 349:12-415:10, April 1, 2009, Docket No. 976) testified that he conducted surveillance of Avendano's shop on December 7, 2006.  (*Id.* at 352:20-23.)  He saw a silver BMW pull up that he later learned was often used by Defendant.  (*Id.* at 353:7-354:16.)  He saw a Hispanic man in a white jacket get out of the BMW, go into Avendano's shop, and within five minutes, leave the shop and depart in the BMW. (*Id.* at 354:3-355:3.)  Prince followed the BMW to a residence where it parked and the same man in the white jacket and another Hispanic man got out and went into the residence across the street.  (*Id.* at 355:8-16.)  The two later walked out of the residence with another man, got back into the BMW and drove off.  (*Id.* at 355:21-356:3.)  Prince attempted to follow the BMW from the residence, but lost sight of it. (*Id.* at 357:4-7.)  However, approximately 20 minutes later, he began surveillance at a Baskin Robbins, where he saw the same BMW, but the car soon moved to a different area of the parking lot which was out of his sight.  (*Id.* at 357:10-358:10.)  Once the

BMW left, Prince followed it to an apartment complex where the same two Hispanic men got out and walked into either apartment number 138 or 140.  (*Id.* at 358:14-25.) Although Prince was not able to say whether either of the two men was Defendant (*id.* at 371:7-12), he later learned that one of those apartments was registered to Defendant (*id.* at 359:3-5).  At approximately 6 p.m. that night, Prince conducted surveillance at the same apartment complex (*id.* at 359:6-12), where he saw a silver Chevy Malibu pull into the parking lot, and the same Hispanic man in the white jacket got out of the Malibu and entered either apartment 138 or 140 (*id.* at 359:9-18). However, Prince was never able to identify Defendant at any of these locales, nor could he confirm that he saw any drug transaction occur.

## Count 17

As to Count 17 (December 13, 2006)–again distribution or possession with intent to distribute 500 grams of cocaine--the government presented the testimony of a drug dealer named Rusty Martinez ("Martinez"), a codefendant in this case.  (Trial Tr. 313:14-349:8, April 1, 2009, Docket No. 976.)  He testified that he was familiar with a number of people Camacho used to deliver drugs to him, including someone named Oscar, whom he first met on December 13, 2006 when he delivered three kilograms of cocaine to Martinez from Camacho.  (*Id.* at 320:6-321:15.)  Since Martinez did not pay Defendant for some of the drugs, Defendant returned in a Hummer later that night to pick up the money Martinez owed him.  (*Id.* at 323:23-324:3; 333:4-7; 346:10-12.)  The government played a number of recorded telephone calls from December 13, 2006 which corroborate this testimony.  (*Id.* at 322:3-

323:21.)

Prince also received information that a transaction was going to occur on December 13, 2006 between Martinez and Camacho, or someone acting on Camacho's behalf, and he conducted surveillance at Martinez' apartment. (*Id.* at 361:9-21.) He observed a white H2 Hummer pull up in front of the apartment, saw the driver get out and go to the door of Martinez' apartment, speak briefly with Martinez, and then come back to move the Hummer. (*Id.* at 361:22-362:11.) Shortly thereafter, Martinez came out of the apartment, opened the back of the Hummer, placed a box in the rear of the Hummer on the driver's side, and then went back into the apartment. (*Id.* at 362:12-17.) However, Prince was not able to identify who the driver of the Hummer was. (*Id.* at 394:22-395:3.)

During Defendant's cross examination of Prince, he testified that he was not sure if December 13, 2006 was the last time he saw Defendant. (*Id.* at 364:10-15.) On redirect, the prosecutor asked Prince if he had a chance to review his notes over the lunch hour to find out that there was a date after December 13, 2006 when he saw Defendant. (*Id.* at 397:7-9.) Prince testified that he had done so and that he remembered that he had also seen Defendant on February 17, 2007. (*Id.* at 397:7-12.) After a conference at the bench on the issue, I allowed Prince to testify that on February 17, 2007, he saw a gray Ford Taurus arrive with Defendant in the passenger seat. (*Id.* at 397:18-404:19.) The Taurus parked next to a white Saturn and Defendant got out of the Taurus and into the Saturn. (*Id.* at 404:17-23.) Both cars then left the parking lot, drove to a nearby McDonald's, parked, and Defendant

got out of the Saturn and back into the Taurus. (*Id.* at 404:24-405:8.) Both cars left the parking lot and officers stopped the Saturn and found cocaine inside. (*Id.* at 405:13-23.) Prince also testified that he was doing surveillance later that afternoon near a business when he saw the same Taurus arrive at the business, along with other vehicles. (*Id.* at 406:20-407:2.) Prince saw Defendant and others get out of their vehicles and go inside the business, then return to their vehicles and leave. (*Id.* at 407:3-8.)

After Defendant left, officers conducted a traffic stop on the Taurus, confirmed that Defendant was one of the occupants, and found cocaine concealed in a locked, hollowed out dictionary in the back seat of the car, to which the other occupant of the car had the key. (*Id.* at 407:6-408:3.) After the evidence was completed that day, I determined that Prince's testimony regarding what occurred on February 17, 2007 should not have been admitted under Rule 404(b) of the Federal Rules of Evidence. (*Id.* at 463:21-472:14.) After input from both parties, I gave the jury the following limiting instruction at the close of the evidence:

> The defendants are not on trial for any act or conduct not specifically charged in the indictment. And in this regard, I want to observe for you that during the course of trial, over defendant's objection, I allowed Officer Prince to testify as to his ongoing surveillance of the defendant Garcia-Ruiz in matters that were unrelated to the charges that are before you. And you heard some testimony that with another individual there were some drugs found in the car. That evidence regarding the drugs should not have been admitted under the rules of evidence, in my opinion, and I ask you to disregard it. In general, the fact that someone [ ] accused of the crime may have committed another crime is not to be allowed in as evidence that he committed the crime with which he's charged. So I ask you to disregard

that piece of evidence that was given to you.

(Trial Tr. 545:21-546:10, April 2, 2009, Docket No. 977.)

### Count 24

As to Count 24–another charge of distribution or possession with intent to distribute--Martinez testified that on January 28, 2007, Defendant was attempting to help him get drugs from a source other than Camacho because Camacho was unavailable. (Trial Tr. 324:4-330:23, April 1, 2009, Docket No. 976.) The government introduced a recorded phone call in which Defendant told Martinez, ". . . cause [sic] he won't let it go like that. Not to me. It's not like, you know, like my cousin. You know what I mean?" (Trial Ex. 67b.) Martinez testified that in the telephone conversation, Defendant was referring to the fact that the source of the drugs might not be comfortable giving Defendant and Martinez such a large quantity of cocaine, and that Defendant's reference to his "cousin" was to Camacho. (Trial Tr. 330:5-14, April 1, 2009, Docket No. 976.) Martinez testified that after that phone conversation, Defendant picked him up and they went to a house and went inside. (*Id.* at 339:14-342:24.) Once inside the house, Martinez testified that he went into a room, the door was shut, and then someone came in with drugs. (*Id.* at 343:15-24.) At that point, Martinez testified that either Defendant or one of Defendant's friends handed him the drugs, and in exchange, he handed money to either Defendant or one of Defendant's friends. (*Id.* at 331:15-332:6.) Once the exchange was completed, Martinez testified that he and Defendant got back into Defendant's car and went back to Martinez' apartment, where Martinez paid Defendant for assisting

Martinez obtain the drugs. (*Id.* at 332:7-16.) The government also introduced a number of recorded phone calls which corroborated Martinez' testimony about this drug transaction. (*Id.* at 324:12-330:23.)

### Count 26

With regard to Count 26–charging Defendant as an illegal alien in possession of a gun--police officers executed a search warrant at Defendant's residence on April 26, 2007. (*Id.* at 448:21-449:6.) Special Agent Christopher Amon ("Amon") testified that during the search, officers found a Tanfaglio model EAA .380 semiautomatic pistol in a purse underneath the kitchen sink. (*Id.* at 449:13-150:5.) The parties stipulated that the firearm had been transported in foreign and interstate commerce (*id.* at 450:13-14) and that Defendant was an alien who was illegally and unlawfully in the United States (*id.* at 450:15-17).

### Count 2

As to Count 2–conspiracy to distribute and possess with the intent to distribute 5 kilograms or more of cocaine involving Defendant, Roberto Lopez and others–the Government presented the evidence mentioned above as well as significantly more not otherwise specifically challenged by Defendant's motions.

During deliberations, the jurors submitted a question which read:

> As to the special verdict regarding Count 2, defendant OSCAR GARCIA-RUIZ: does the phrase ". . . conspired to distribute or possess with intent to distribute . . ." refer to the alleged conspiracy as a whole; the sum total of Oscar Garcia-Ruiz's involvement; or the maximum amount of cocaine Oscar Garcia-Ruiz distributed or possessed with intent to distribute on any one occasion?

(Note to the Court 1, Docket No. 928-6.) I responded with a note which read, "Members of the Jury: The special verdict forms as to Count Two refer to the conspiracy as a whole." (*Id.* at 2.) The following day, the jury returned a guilty verdict against Defendant on Counts 2, 15, 17, 24, and 26. (Docket No. 928-7.)

After the verdict was entered, I orally denied Defendant's motion for a judgment of acquittal. Defendant then timely renewed his motion pursuant to Rule 29 in writing (Docket No. 1010). Specifically, Defendant argues that he was never identified as the party involved in the transaction on December 7, 2006, because Prince was not able to positively identify Defendant as the person he saw that day and Avendano testified that he did not recall who brought him drugs that day. (*Id.*)

Defendant also timely filed an alternative Motion for a New Trial (Docket No. 1009) arguing not only insufficiency of the evidence as to Count 15, but also introduction of inadmissible evidence, and an erroneous instruction.

### Standard of Review

In determining whether to grant a defendant's motion for judgment of acquittal, I "ask only whether taking the evidence - both direct and circumstantial, together with the reasonable inferences to be drawn therefrom - in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. McKissick*, 204 F.3d 1282, 1289 (10th Cir. 2000) (quoting *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999)). "[C]ircumstantial evidence is entitled to the 'same weight' as direct evidence." *United States v. Winder*, 557 F.3d 1129, 1137 (10th Cir. 2009) (quoting *United States v. Brunson*, 907

F.2d 117, 119 (10th Cir. 1990)). Because "[i]t is for the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented," *McKissick*, 204 F.3d at 1289-90 (citing *Untied States v. Nieto*, 60 F.3d 1464, 1469 (10th Cir. 1995), *cert denied*, 516 U.S. 1081 (1996)), I "may neither weigh conflicting evidence nor consider the credibility of witnesses," *id.* at 1289 (quoting *United States v. Pappert*, 112 F.3d 1073, 1077 (10th Cir. 1997)). "To sustain a criminal conviction, the Government's evidence must be 'substantial' or raise more than a 'mere suspicion of guilt,' but it need not disprove every other reasonable theory of the case." *Winder*, 557 F.3d at 1137-38 (citing *United States v. Caraway*, 534 F.3d 1290, 1293 (10th Cir. 2008)).

Rule 33 of the Federal Rules of Criminal Procedure allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). "[I]n deciding a motion for new trial, the court may weigh the evidence and consider the credibility of the witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred." *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994) (quoting district court and stating that district court correctly stated the standard). Motions for new trials are viewed with disfavor. *United States v. Lamy*, 521 F.3d 1257, 1266 (10th Cir. 2008). A new trial should be granted "only in exceptional cases in which the evidence preponderates heavily against the verdict." *Evans*, 42 F.3d at 593-94 (quoting district court and stating that district court correctly stated the standard).

Discussion

**Motion for Judgment of Acquittal**

The focus of Defendant's Rule 29 motion is Count 15, the December 7, 2006 drug transaction between Camacho and Avendano, which forms the basis for the charge of distribution or possession with the intent to distribute more than 500 grams of cocaine. As the evidence summarized above makes clear, a drug transaction did occur on that date between those two codefendants. The evidence is also clear that another person was involved in the delivery of the drugs. Who that person was, however, is not clear. At trial, two quite disparate witnesses, Avendano, a codefendant, and Prince, a surveilling police officer who had familiarity with Defendant from other dealings, could not identify him at trial as the third individual involved in the December 7, 2006 drug transaction. Given that failure of identification, Defendant argues that a reasonable juror could not have found him guilty beyond a reasonable doubt, relying principally upon *United States v. Valadez-Gallegos*, 162 F.3d 1256 (10th Cir. 1998).

The government responds that, viewing the evidence in the light most favorable to it, a reasonable jury could convict based upon circumstantial evidence, including Defendant's use of the identified BMW, the presence of the BMW where Defendant lived, reference by Camacho to sending his cousin, a term other witnesses said Camacho used when referring to Defendant, and finally, a videotape of someone of similar build to Defendant exiting the BMW. In addition, I take note of the evidence from Officer Prince identifying Defendant in a subsequent drug

11

transaction that was first admitted under Rule 404(b) and then ruled inadmissible.

As the government observes, conviction may well be based upon inference but we also should "not uphold a conviction by piling inference upon inference . . . . The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt."  *Valadez-Gallegos*, 162 F.3d at 1262 (internal quotations omitted).

Certainly the circumstantial evidence here may be consistent with Defendant's involvement on December 7, 2006, but it is more in the nature of suspicion than substantial proof.  A reference to "my cousin" may be quite limiting for some while expansive for members of large families.  The record discloses nothing on this point. The videotape is inconclusive at best, as is the evidence of Defendant's use of the BMW.  As to the subsequent transaction, even if properly admitted as Rule 404(b) evidence of identity or another permitted purpose, it is insufficient to convict, as it does not establish Defendant's involvement in the December 7, 2006 transaction or his knowledge, possession, or intent.  *See id.* at 1263.  Most significantly, the inability of two witnesses with much different perspectives, one of whom was sufficiently familiar with Defendant to otherwise identify him in the December 7, 2006 transaction, raises reasonable doubt in face of a compounding of inconclusive inferences.  Accordingly, I conclude that Defendant's Rule 29 Motion for Judgment of Acquittal should be granted because the evidence concerning Count 15 may raise suspicion but it is not substantial enough for a reasonable jury to find Defendant guilty beyond a reasonable doubt.

If Defendant intended his Rule 29 motion to extend to other counts of the

conviction, Defendant has failed to present any reasonable argument why the evidence summarized above is not sufficient for a reasonable jury to convict and his Rule 29 motion is otherwise denied.

## Motion for a New Trial

Defendant alternatively moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure and states three grounds for his request: (1) insufficient evidence, (2) introduction of inadmissible evidence, and (3) erroneous supplementary instruction regarding Count 2. (Def.'s Mot. for a New Trial.) I will address each of Defendant's arguments in turn.

As to his arguments concerning insufficiency of the evidence, Defendant asserts that a "court's power to grant a . . . [n]ew [t]rial is much broader than its power to grant an acquittal motion. When the evidence is technically sufficient to withstand an acquittal motion, the court remains free to grant a new trial if the verdict is against the weight of the evidence." (*Id.* at 1-2.) Defendant further states that I need not view the evidence in the light most favorable to the government in resolving his Motion for a New Trial. (*Id.* at 2.) As support for these propositions, Defendant cites four cases, none of which are from the Tenth Circuit. (*Id.*) In response, the government contends that because "sufficiency of the evidence claims are governed only by Rule 29, Defendant cannot raise it pursuant to Rule 33." (Pl.'s Opposition to Def.'s Mot. for a New Trial 2.) The government claims that Defendant's arguments are improper under Rule 33 because "he is trying to get two bites at the apple by re-raising the same argument, but mistakenly asserting that a lower standard of review .

13

. . applies." (*Id.*)  The government cites no authority for this proposition.

Neither party is entirely correct.  Contrary to the government's position that such motions based on claimed insufficiency of the evidence may only be raised under Rule 29, the Tenth Circuit has addressed motions for a new trial under Rule 33.  *See United States v. Zabriskie*, 415 F.3d 1139, 1144-47 (10th Cir. 2005).  However, although Defendant claims that a lower standard of review applies to a Rule 33 motion, the Tenth Circuit applies the same standard of review as it applies to motions for judgment of acquittal based on insufficiency of the evidence under Rule 29.  *See id.* at 1144 (stating that in evaluating sufficiency of the evidence challenges, the court will "ask only whether taking the evidence - both direct and circumstantial, together with the reasonable inferences to be drawn therefrom - in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." (citing *Hanzlicek*, 187 F.3d at 1239)).  Given the fact that I have already evaluated Defendant's claims regarding insufficiency of the evidence under this standard, I need not address them again here.

Defendant also states that he should be granted a new trial because "over Defendant's objection, the jury heard evidence of a traffic stop implicating Defendant in a drug transaction on February 17, 2007. . . .  At the close of the evidence, the Court determined that the evidence was inadmissible and instructed the jury to disregard the evidence . . . ."  (Def.'s Mot. for a New Trial 2.)  Defendant contends that although it is presumed that jurors will follow clear instructions to disregard evidence, "the inadmissible evidence in the present case prejudiced [Defendant] to a

14

degree that could not be cured by an instruction." (*Id.*)

The government responds that the evidence was not, in fact, inadmissible, and that even if the evidence should have been excluded, "the law is well-settled that jurors are presumed to follow the Court's order to disregard the evidence," (Pl.'s Opposition to Def.'s Mot. for a New Trial 2), and that "this evidence can hardly be characterized as 'unduly prejudicial' in light of the reams of other evidence presented at trial of Defendant's involvement in the large drug conspiracy . . . ." (*id.* at 3).

I decline to revisit my ruling at trial that the evidence should have been excluded under Rule 404(b). However, "[w]e presume that jurors will follow clear instructions to disregard evidence unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Lamy*, 521 F.3d at 1266 (internal quotations omitted). Defendant has presented no specific argument regarding why there is an overwhelming probability that the jury would have been unable to follow my instructions or why there exists a strong likelihood that the effect of the evidence was devastating to him, but rather simply "contends that the inadmissible evidence in the present case prejudiced him to a degree that could not be cured by an instruction." (Def.'s Mot. for a New Trial 2.) I discern no reason why the jurors did not follow my instruction; nothing indicates that there is an overwhelming probability that the jury was unable to follow the instruction, nor do I know of any reason why there would exist a strong likelihood that the effect of the evidence was devastating to Defendant, particularly given my judgment of acquittal

on Count 15.

Defendant's final argument in his Motion for a New Trial is that my answer to the jury's question regarding Count 2 and the quantity of cocaine involved, was erroneous. Specifically, Defendant argues, "The Court's Supplemental Jury Instruction should have limited the jury's consideration to quantities attributable to the conspiracy *after* [Defendant] joined the conspiracy and *before* he left the conspiracy." (Def.'s Mot. for a New Trial 3.) As support for this argument, Defendant cites to a number of cases, including *Pinkerton v. United States*, 328 U.S. 640 (1946), *United States v. Richards*, 204 F.3d 177 (5th Cir. 2000), *United States v. O'Campo*, 973 F.2d 1015 (1st Cir. 1991), *Glazerman v. United States*, 421 F.2d 547 (10th Cir. 1970), and *United States v. Gallant*, 537 F.3d 1202 (10th Cir. 2008). Defendant also argues that my answer to the jury's question was inconsistent with the United States Sentencing Guidelines § 1B1.3, comment. (n.2).

On this point, the government is correct that the Tenth Circuit has already rejected Defendant's argument. In *United States v. Stiger*, the court stated, "*Apprendi* requires the jury only to set the 'maximum sentence ([i.e., the] ceiling)' under which each coconspirator's sentence must fall." 413 F.3d 1185, 1193 (10th Cir. 2005) (citing *Knight*, 342 F.3d 697, 711 (7th Cir. 2003)). The court stated that it is the judge's role to "determine the 'floor' by finding the precise drug quantity attributable to each coconspirator." *Id.* The reasoning for the court's holding in *Stiger* was that "the sentencing judge's findings do not, because they cannot, have the effect of increasing an individual defendant's exposure beyond the statutory

16

maximum justified by the jury's guilty verdict." *Id.* Rather, "the jury sets the applicable 'statutory maximum' by determining the type and quantity of drugs attributed to the conspiracy as a whole while the judge's findings have the effect only of potentially decreasing an individual defendant's sentence." *Id.* Accordingly, my response to the jury's question regarding the drug quantity at issue in Count 2 was not erroneous.

Defendant also contends that my answer to the jury's question regarding the drug quantity in Count 2 was inconsistent with section 1B1.3 comment (n.2) of the Untied States Sentencing Guidelines, which states that a defendant's relevant conduct should not include conduct of members of the conspiracy prior to the defendant joining the conspiracy. However, Defendant's motion is premature, as I have not yet sentenced Defendant and accordingly have yet to determine the floor of Defendant's sentence by finding the precise drug quantity attributable to him.

Accordingly, it is ordered:

1. Defendant's Motion for Judgment of Acquittal is granted as to Count 15 and denied as to all other counts;

2. Defendant's Motion for a New Trial is denied; and

3. Judgment of Acquittal in favor of Defendant on Count 15 shall enter.

DATED at Denver, Colorado, on January 11, 2010.

        BY THE COURT:


        s/ Walker D. Miller

        United States Senior District Judge